**Case No. 25-12890-C**

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

**JOSEPH DEAN,**

Plaintiff-Appellant,

v.

**ROKU, INC.,**

Defendant-Appellee.

*Appeal from the United States District Court
for the Middle District of Florida
Tampa Division
District Court Case No. **8:24-cv-02383-WFJ-TGW**
The Honorable William F. Jung, District Judge*

---

**OPENING BRIEF OF PLAINTIFF-APPELLANT**

---

Joseph Dean, Pro Se
Plaintiff – Appellant

5131 Mayfair Park Court
Tampa, Florida 33647
(310) 593-4485

joe@joedean.net

*Joseph Dean v Roku Inc*    Case No. 25-12890-C

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1, Plaintiff-Appellant Joseph Dean certifies that the following persons and entities have an interest in the outcome of this case or appeal:

- Aspis, Norman – Counsel for Defendant-Appellee, Dentons US LLP

- Dean, Joseph – Plaintiff-Appellant, pro se

- DeGori, Elizabeth – Counsel for Defendant-Appellee, Dentons US LLP

- Dentons US LLP - Counsel for Defendant-Appellee

- Javidzad, Bety – Counsel for Defendant-Appellee, Dentons US LLP

- Jung, William F. - U.S. District Judge, Florida Middle, Tampa

- Roku, Inc. – Defendant-Appellee

- Veamcast Corp. – Florida corporation, wholly owned by Plaintiff-Appellant

- Wilson, Thomas G. - U.S. Magistrate Judge, Florida Middle, Tampa

**Page C-1 of 2**

i

*Joseph Dean v Roku Inc*    *Case No. 25-12890-C*

No publicly held corporation owns 10% or more of any party's stock.

Respectfully submitted,

Joseph Dean, Plaintiff-Appellant, Pro Se

**Dated**: September 25, 2025

**Page C-2 of 2**

**STATEMENT REGARDING ORAL ARGUMENT**

Appellant respectfully requests oral argument if the Court determines that oral argument would assist in the resolution of the issues presented.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE

DISCLOSURE STATEMENT ................................................................... *C-1*

STATEMENT REGARDING ORAL ARGUMENT.......................................... iii

TABLE OF CONTENTS ................................................................... iv

TABLE OF AUTHORITIES ................................................................ vi

STATEMENT OF JURISDICTION ........ ....................................................... viii

STATEMENT OF THE ISSUES .................... ..... ...................................................... 1

STATEMENT OF THE CASE ............................................................. 6

Statement of the Facts...................................... ........................................ 8

A. Veamcast Development and Roku's Initial Encouragement .................. 8

B. Roku's Market Position and Strategic Reversal ........................................ 9

C. Systematic API Restrictions ............................................................. 9

D. Developer Recognition and Forum Suppression ..................................10

E. Frndly TV Acquisition and Platform Leveraging ................................... 11

F. Procedural History ................................................................. . 11

SUMMARY OF THE ARGUMENT .. ................................................................ 13

ARGUMENT........................................................................................... 15

A. The District Court Erred by Striking Plaintiff's Supporting Appendix with No Explanation ..................................................15

B. The Court Improperly Denied Leave to Amend ............................... 16

C. Appellant Adequately Alleged Antitrust Injury and Efficient Enforcement ....................................................................................... 20

D. The Appellant Adequately Defined the Relevant Markets ........... 35

E. The Evidence Establishes Roku's Monopoly Power ....................... 43

F. The District Court Erred in Finding Roku's Discriminatory API Termination Lawful Under Aspen Skiing ..................................... ......... 50

G. Appellant Has Individual Standing ..................... ........................... 63

H. The Court Created a Procedural Trap .............................................. 66

CONCLUSION ........................................................................................... 68

CERTIFICATE OF COMPLIANCE ................................... ........................... 71

CERTIFICATE OF SERVICE ... ................................................................... 72

# TABLE OF AUTHORITIES

**Cases**

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) ............................................................... . 3, 14, 18, 22, 50–53, 62–63, 69

*Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) ................................. 31

*Board of Trustees of Leland Stanford Junior University v. Roche Molecular Systems, Inc.*, 563 U.S. 776 (2011) ........................................................ 64

*Bryant v. Dupree*, 252 F.3d 1161 (11th Cir. 2001) ............................................. 17

*Dean v. Meta Platforms, Inc.*, No. 8:24-cv-02242 (M.D. Fla.) ........................... 56

*DDB Technologies, L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284 (Fed. Cir. 2008) ....................................................................... 64

*Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992) ............. ...................................................................................... 40, 43

*FilmTec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568 (Fed. Cir. 1991) ................. 64

*Foman v. Davis*, 371 U.S. 178 (1962) ....... ....................................................... 16

*FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34 (D.D.C. 2022) ................ 22, 54, 62, 69

*FTC v. Meta Platforms, Inc.*, No. 1:20-cv-03590 (D.D.C.) ............................... 45

*Morris Communications Corp. v. PGA Tour, Inc.*, 364 F.3d 1288 (11th Cir. 2004) ....... ................................................................................. 51

*Ohio v. American Express Co.*, 585 U.S. 529 (2018) ...... ...................................... 41

*United States v. Connecticut National Bank*, 418 U.S. 656 (1974) ... ............. 36, 63

*United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024) .... .............. 23, 45

*United States v. Google LLC*, No. 1:23-cv-00108-LMB-JFA, 2025 U.S. Dist. LEXIS 74956 (E.D. Va. Apr. 17, 2025) ...... ................................. 22, 42, 45–46, 55

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) .................................... 36, 63

*\*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ...........................
........................................................................ 20, 45, 54–55, 58, 69

*Veamcast Corp. v. Facebook, Inc.*, No. 8:20-cv-2667 (M.D. Fla.) ................. 4, 66

*Veamcast Corp. v. Roku, Inc.*, No. 8:24-cv-02113 (M.D. Fla.) ............................ 5

*Verizon Communications Inc. v. Trinko*, 540 U.S. 398 (2004) ... ... 3, 14, 51-52, 63

**Statutes**

15 U.S.C. § 2 .......................................................................................... viii

15 U.S.C. § 15 ......................................................................................... viii

28 U.S.C. § 1291 ..................................................................................... viii

28 U.S.C. § 1331 ..................................................................................... viii

**Rules**

Fed. R. Civ. P. 12(b)(6) ....................................................... 15, 25, 28, 66

Fed. R. Civ. P. 12(f) .......................................................................... 15

Fed. R. Civ. P. 15(a) ......................................................................... 16

Fed. R. Civ. P. 15(a)(2) ................................................................. 1, 66

Fed. R. Civ. P. 15(c) ......................................................................... 67

Fed. R. Civ. P. 17(a)(3) ..................................................................... 71

Fed. R. App. P. 32(a)(5) .................................................................... 72

Fed. R. App. P. 32(a)(6) .................................................................... 72

Fed. R. App. P. 32(a)(7)(B) ............................................................... 72

Fed. R. App. P. 32(f) ......................................................................... 72

## I. STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 over this appeal from a final order of the United States District Court for the Middle District of Florida. The district court had subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 15 U.S.C. § 15 (Clayton Act private right of action for violations of 15 U.S.C. § 2 (Sherman Act)). The Order appealed from was entered on August 8, 2025, and notice of this appeal was timely filed on August 19, 2025 within 30 days thereof.

## II. STATEMENT OF THE ISSUES

1. **PROCEDURAL DUE PROCESS:** Did the district court violate Plaintiff's due process rights by arbitrarily striking Plaintiff's supporting Appendix without citing any rule, legal authority or reasoning, creating an unexplained ruling that prevented both Plaintiff and the appellate court from understanding the basis for the action and denied consideration of properly filed supporting evidence?

2. **LEAVE TO AMEND:** Did the district court err in denying leave to amend under Federal Rule of Civil Procedure 15(a)(2) where Appellant had already filed comprehensive amendments addressing identified deficiencies and no undue delay, prejudice, or futility existed?

3. **MARKET DEFINITION:** Did the district court err in dismissing Appellant's Sherman Act and Clayton Act claims for failure to adequately define relevant markets where Appellant alleged two economically distinct markets supported by functional interchangeability analysis and cross-elasticity of demand evidence: (a) applications that control and interact with Roku devices, constituting a Kodak aftermarket with post-purchase lock-in effects, specialized API dependencies, distinct customer bases (Roku device owners), and no

1

functional substitutes, and (b) U.S. streaming platform operating systems with substantial barriers to entry, network effects, and industry recognition as a discrete economic sector encompassing embedded TV operating systems, platform services, content discovery interfaces, and advertising delivery systems serving Roku's 89.8 million and fast-growing households as reported in its 2024 annual report?

4.  **MONOPOLY POWER**

4a. **DIRECT EVIDENCE OF MONOPOLY POWER:** Did the district court err in finding insufficient monopoly power where Appellant alleged direct evidence including exclusive control over essential APIs, ability to unilaterally modify API access without market consequences, 100% foreclosure of third-party applications through contradictory technical requirements, and capacity to coerce consumer acceptance of restrictive legal terms through device lockouts, demonstrating the absence of competitive constraints that would normally discipline such conduct?

4b. **CIRCUMSTANTIAL EVIDENCE OF MONOPOLY POWER:** Did the district court err in finding Roku's 48.3% market share insufficient where such share was combined with barriers to entry, network effects,

rapid growth from 33% to 48.3% over four years, and control over 90 million streaming households?

5. **REFUSAL TO DEAL:** Did the district court err in characterizing Defendant's discriminatory termination of prior voluntary dealing as falling within the general Trinko no-duty rule rather than the narrow *Aspen Skiing* exception, where Appellant alleged that Roku previously made its APIs openly available and actively encouraged third-party use, then covertly and retroactively terminated that voluntary and profitable course of dealing while continuing to maintain identical functionality for its own applications, and where the court misunderstood the economic significance of the affected markets by failing to recognize that Roku's deliberate API restrictions eliminated entire categories of competitive applications across economically significant streaming platform markets representing billions in consumer spending and advertising revenue for 90 million households, constituting market-wide foreclosure through technical manipulation rather than legitimate business decisions?

6. **ANTITRUST STANDING:** Did the district court err in finding that Appellant lacks antitrust standing where Appellant alleged (a) antitrust

injury through systematic foreclosure of him and all other third-party developers from the market for applications that interact with Roku devices, and (b) efficient enforcer status as a directly excluded competitor, and where the court misunderstood that Roku's "contradictory security requirements" created impossible compliance scenarios that systematically eliminate existing and future competition under the *Associated General Contractors* test as applied by the Eleventh Circuit?

7. **INDIVIDUAL STANDING:** Did the district court err in finding that Appellant lacks individual standing to bring antitrust claims where Appellant alleged personal economic harm from developing Veamcast applications in his individual capacity since 2010, retaining all intellectual property rights, while the corporate entities had no investors or employees and was formed only for potential investment purposes which were foreclosed by Defendant's conduct?

8. **PROCEDURAL FAIRNESS:** Did the district court err in dismissing Appellant for lack of individual standing where Appellant, following judicial guidance from this district in *Veamcast Corp. v. Facebook, Inc.*, No. 8:20-cv-02667-CEH-AEP, to pursue claims individually rather than

4

corporately, structured this litigation accordingly, only to be dismissed

for pursuing the very approach this district had recommended, and

where the court should have permitted reopening of the dismissed

corporate case *Veamcast Corp. v. Roku, Inc.*, No. 8:24-cv-02113-SDM-AEP,

to allow individual pursuit of the claims rather than dismissing for

standing?

5

## III. STATEMENT OF THE CASE

This antitrust action challenges Roku's systematic use of its platform dominance to foreclose competition in the markets for (1) applications that control and interact with Roku devices and (2) streaming platform operating systems.

After initially encouraging third-party development, Roku covertly and retroactively restricted API access specifically targeting competitive functionality while maintaining the same capabilities for its own applications. These restrictions eliminated Appellant's and all other third-party developers' ability to compete, causing substantial economic harm through wasted development costs, lost revenue, and foreclosure from the market, as well as harm to competition and the market generally, stifling innovation and discouraging future market entrants.

On May 1, 2025, Plaintiff filed a Motion for Leave to Amend (Doc. 27) with two attachments: the proposed Second Amended Complaint (Doc. 27-1) and an Appendix (Doc. 27-2) containing supporting exhibits including video demonstrations of Plaintiff's competitive applications (Ex-5).

On May 7, 2025, Magistrate Judge Wilson entered Order 29, which granted the motion for leave to amend but also directed that "the Appendix will be

stricken" without providing any legal basis or reasoning for this action. The Second Amended Complaint was subsequently docketed as Document 30 without the supporting appendix that had been part of Plaintiff's motion. On August 8, 2025, District Judge Jung dismissed with prejudice for failure to state a claim (Dkt 60). The Court ruled on an incomplete record, having earlier struck Plaintiff's supporting exhibits without explanation and without considering the video evidence and other exhibits they contained. The Court did not consider that Roku's restriction stating "ECP commands may not be sent from 3rd-party platforms (for example, mobile applications)" constituted a 100% foreclosure of the mobile application market for Roku device control applications, eliminating all third-party competition in this space while preserving full functionality for Roku's own apps. The Court also failed to consider other evidence of monopoly power, both direct and indirect, that had been contained in the stricken appendix. The court further denied Appellant's motion for leave to file a Third Amended Complaint, concluding amendment would be futile, but provided no analysis of the proposed complaint's content, enhanced allegations, newly discovered evidence, or basis for the futility determination.

7

**Statement of the Facts**

**A. Veamcast Development and Roku's Initial Encouragement**

Since 2010, Appellant has developed software applications under the name Veamcast. VEAM is an acronym for Video Email and More. The applications included Windows apps, mobile apps, Roku apps, web services, and web-based interfaces.  Key features enhance the streaming experience for Roku users through remote control capabilities, content discovery, second screen experiences and social sharing features. (Doc. 30, ¶ 2). The applications rely heavily on Roku's proprietary Application Programming Interface (API), specifically External Control Protocol (ECP) commands necessary for remote control, deep linking functionality into other apps necessary for content curation, and search functionality necessary for content discovery across streaming services. (Doc. 30, ¶ 15, Ex. 5).

Roku's CEO initially promised to "let third parties publish content and applications that consumers can access directly from their TV." (Doc. 30, ¶ 5). Based on this encouragement, Appellant invested substantial time and resources developing Roku-compatible applications. (Doc. 30, ¶ 7).

**B. Roku's Market Position and Strategic Reversal**

Roku achieved dominant market position, controlling 48.3% of the U.S. streaming platform market as of Q1 2024, growing from 33% in 2020, and serving 90 million streaming households by February 2025. (Doc. 30, ¶ 35; Dkt. 60, p. 18).

After achieving market dominance, CEO Anthony Wood revealed Roku's strategic reversal: "actually the future of TV is not apps because people are tired of looking in 6,000 apps for content... We have something called the Roku Channel... So, we think things like the Roku Channel will become the way content publishers end up publishing on platforms." (Doc. 30, ¶ 24). The Roku Channel is Roku's own content aggregation and advertising platform that competes directly with third-party content discovery applications like Veamcast for user engagement.

**C. Systematic API Restrictions**

Roku then implemented technical restrictions targeting competitive functionality. By August 2024, Roku's official documentation stated: "ECP commands may not be sent from 3rd-party platforms (for example, mobile applications)." (Doc. 30, Ex. 4b). In February 2025, after litigation commenced, Roku added a contradictory requirement: "Control by mobile

apps must be Enabled for a Roku device to receive ECP commands." (Doc. 30, Ex. A3).  These requirements cannot be satisfied simultaneously. By that time, they had also begun to restrict deep linking from third-parties.

Also post litigation, Roku finally confirmed the 'search' command had been discontinued although it had been nonfunctional at least since October 2023, approximately 16 months before the announcement. Roku preserved all capabilities for Roku's own applications, while restricting functionality for all third-party applications. (Doc. 30, Exs. A3, B, 5).

**D. Developer Community Recognition and Forum Suppression**

Developer community forums documented the systematic nature of these restrictions. Roku Community Streaming Expert "renojim" confirmed: "They may be trying to kill off the numerous paid Roku remote apps." (Doc. 30, Ex. 4a). A user named "michalama" responded within minutes to confirm the restrictions with definitive language, notably lacking the "I am not a Roku employee" disclaimer that appeared on all other participants' posts (Doc. 30, Ex. 4a).  That post was later deleted.

When Appellant questioned suspicious forum activity and requested identification "for my lawyer," Roku's system blocked the post, displaying: "The word 'lawyer' is not permitted in this community." (Doc. 30, Ex. 6).

10

Multiple independent developers on Roku's forums documented discovering the systematic API removals, with developer "DP_Tech" reporting that search functionality "is no longer functioning" and developer "user442" stating "I just spent hour trying to figure out why I couldn't do this" before learning through the forum that Roku had secretly disabled the feature. Appellant also posted in this thread stating "Unreal you still haven't updated this. Anybody home Roku?" (Doc. 30, Ex. B).

**E. Frndly TV Acquisition and Platform Leveraging**

On May 1, 2025, Roku announced it had acquired Frndly TV for $185 million. CEO Wood explicitly stated Roku's intent to weaponize platform power: "We're going to use that [platform power] to drive subscriptions. We're going to use that to drive advertising, we're going to use that to drive Frndly." This demonstrates Roku's strategic use of platform power to promote its own acquisitions and services, while simultaneously implementing API restrictions that foreclose competitive third-party developers like Veamcast from utilizing platform functionality.

**F. Procedural History**

Earlier in the day on May 1, 2025, Plaintiff filed a Motion for Leave to Amend with supporting exhibits including video demonstrations of

11

competitive applications. (Doc. 27-2). On May 7, 2025, Magistrate Judge Wilson granted leave to amend but directed that "the Appendix will be stricken" without providing legal basis or reasoning. (Doc. 29).

On June 18, 2025, Plaintiff filed a Third Amended Complaint to address identified deficiencies and incorporate significant new evidence, including Roku's May 1, 2025 acquisition of Frndly TV for $185 million and CEO Wood's contemporaneous anticompetitive statements that Roku will disadvantage competition by using platform power to advantage its own services.

On August 8, 2025, District Judge Jung dismissed with prejudice for failure to state a claim and denied leave to file a Third Amended Complaint without analyzing its content or enhanced allegations (Doc. 60). The court made conclusory findings about monopoly power, antitrust standing, and market definition without reviewing the extensive evidence in the proposed Third Amended Complaint, after having struck the Second Amended Complaint's supporting appendix without explanation. The court thus dismissed the case for lack of evidence while preventing any evidence from being considered.

## IV. SUMMARY OF THE ARGUMENT

The district court committed multiple errors requiring reversal and remand.

**First**, the court erred by striking Plaintiff's supporting appendix without legal justification, clear specification, or opportunity to be heard. Order 29 directed that "the Appendix will be stricken" without citing any rule, case law, or reasoning. This arbitrary action violated due process, eliminated critical evidence from the record, and requires immediate reversal.

**Second**, the court erroneously dismissed Appellant's antitrust claims by imposing improper heightened pleading standards that demanded trial-level proof rather than plausible allegations. The court ignored that Roku achieved complete foreclosure of mobile applications controlling Roku devices while maintaining identical functionality for its own apps, demonstrating both individual antitrust injury and market-wide competitive harm.

**Third**, the court incorrectly found insufficient evidence of monopoly power despite Appellant's allegations of direct evidence including exclusive API control, 100% market foreclosure through technical restrictions, and growth from 33% to 48.3% market share over four years.

The court failed to recognize that Roku's deliberate API restrictions eliminated entire categories of competitive applications across economically significant streaming markets serving 90 million households. **Fourth,** the court mischaracterized Roku's discriminatory termination of a prior profitable course of dealing as permissible refusal to deal, ignoring that Roku's CEO explicitly encouraged third-party development before systematically targeting competitive functionality while preserving identical capabilities for Roku's own applications.

This case presents a narrow *Aspen Skiing* refusal-to-deal claim, as opposed to a generalized Trinko no-duty case.  It is supported by direct evidence of monopoly power through discriminatory revocation of interoperability.

**Finally,** the court created an impossible procedural trap by dismissing for individual standing after prior judicial guidance from this district instructed Appellant to pursue claims individually rather than corporately, then denied leave to amend without analyzing whether the proposed Third Amended Complaint would cure identified deficiencies. These errors prevented adjudication on the merits of legally cognizable claims involving platform monopolization through API restrictions, conduct that established precedent recognizes as violating federal antitrust laws.

14

## V. ARGUMENT

The district court erred in dismissing Plaintiff's antitrust claims and denying leave to amend. The court committed fundamental procedural violations by striking supporting evidence without explanation, failed to apply the liberal pleading standards required under Rule 12(b)(6), and misapplied established antitrust law regarding platform monopolization through API restrictions. These errors require reversal and remand.

## A. THE DISTRICT COURT ERRED BY STRIKING PLAINTIFF'S SUPPORTING APPENDIX WITH NO EXPLANATION

### 1. Standard of Review

Court orders striking portions of pleadings must provide articulated reasons that permit meaningful appellate review and allow parties to understand and cure defects.

### 2. The Order Provided No Legal Basis for Striking the Appendix

On May 7, 2025, the court granted leave to file the Second Amended Complaint but simultaneously directed that "the Appendix will be stricken" without any explanation. Doc. 29. The order cited no authority, including Rule 12(f), which governs striking, and requires identification of 'redundant, immaterial, impertinent, or scandalous matter.' None apply.

15

### 3. The Lack of Explanation Violated Due Process

Antitrust cases often require supporting context and technical materials. If the court believed the Appendix contained improper evidentiary or argumentative matter, it should have explained this so Appellant could re-present the content in proper form.

### 4. The Court's Treatment Was Inconsistent

The docket shows that later filings were struck with specific rule-based explanations. Here, by contrast, no explanation was provided. This disparate treatment confirms the arbitrary nature of striking the Appendix without justification.

## B. THE COURT IMPROPERLY DENIED LEAVE TO AMEND

### 1. The Court Applied an Overly Restrictive Standard to Amendment

Rule 15 (a) declares that leave to amend "shall be freely given when justice so requires". *Foman v. Davis*, 371 U.S. 178, 182 (1962). Leave should be denied only for undue delay, bad faith, repeated failure to cure deficiencies, undue prejudice to the opposing party, or futility of amendment. Here, none of these factors supported denial.

16

**2. The Court Failed to Conduct Futility Analysis and Provided No Explanation**

The court erred in denying amendment without examining the proposed Third Amended Complaint's content. *See Bryant v. Dupree, 252 F.3d 1161, 1163 (11th Cir. 2001)* (reversing denial of amendment where the district court failed to articulate a valid reason such as undue delay, bad faith, prejudice, or futility). Courts have consistently held that futility determinations must be based on actual analysis of the proposed pleading, not assumptions about deficiencies in existing complaints.

As the Eleventh Circuit emphasized in Bryant, denial of leave to amend requires meaningful consideration of whether the proposed amendments would cure identified deficiencies. The district court's wholesale denial without analyzing the proposed Third Amended Complaint denied Appellant due process in pleading improvement.

**3. The Proposed Third Amended Complaint Addressed Identified Deficiencies**

The court should have examined how the proposed amendments directly addressed each challenge raised in Roku's motion:

17

### a. Individual Standing Clarification

The Third Amended Complaint clarified Appellant's individual standing by emphasizing substantial personal investment documentation already provided in Exhibit C, demonstrating 2,132 code changes and 34,741 file operations establishing direct personal injury from Roku's conduct.

### b. Strengthened Legal Framework

The proposed complaint incorporated established antitrust precedents including *Microsoft* platform control doctrine and *Aspen Skiing* refusal-to-deal theory, providing robust legal foundation for claims involving systematic API restrictions that courts have recognized as viable antitrust violations in digital markets.

### c. Enhanced Monopoly Power Evidence

The Third Amended Complaint would have supplemented existing allegations with significant new evidence:

- Coercive firmware lock-outs forcing term acceptance affecting 80 million devices
- Roku's May 1, 2025 announcement of the acquisition of Frndly TV for $185 million providing market valuation metrics ($264/user)

- CEO statements from the same day Q1 2025 earnings calls declaring intent to use platform power to favor Frndly for anticompetitive intent

- Updated financial filings showing accelerating platform revenue growth

- Recent contradictory technical requirements creating impossible compliance scenarios (Roku Email to Developers2 - February 2025 *post-litigation*)

### d. Concrete Damages Methodology

The proposed complaint provided detailed valuation methodology using Roku's own acquisition metrics and documented development costs, establishing credible foundation for relief.

### 4. This Was Early-Stage Litigation

The dismissal was particularly inappropriate because this was early-stage litigation where discovery had not yet begun, no scheduling order had been entered, and this was the first substantive court ruling on the merits. Appellant had no prior judicial guidance on the court's specific concerns, and Appellant was responding to motion arguments in good faith.

**5. Federal Policy Strongly Favored Amendment**

Roku demonstrated no meaningful prejudice from allowing amendment.

The case remained at the pleading stage with no discovery costs incurred.

The Federal Rules reflect the principle that cases should be resolved on

their merits. Courts recognize that amendment should be denied only

when controlling precedent establishes that no viable cause of action exists

as a matter of law. Here, controlling precedent from *United States v.*

*Microsoft Corp.* and recent rulings like Judge Boasberg's decision in *FTC v.*

*Facebook* confirm that API restrictions targeting competitive threats state

valid monopolization claims.

**5.  Complex Antitrust Litigation Requires Iterative Development**

Platform monopolization cases involving API restrictions represent

evolving areas of antitrust law requiring sophisticated pleading

development. The Federal Rules impose no numerical limits on good faith

amendments.

**B.  APPELLANT ADEQUATELY ALLEGED ANTITRUST INJURY AND EFFICIENT ENFORCEMENT**

**1. Standard of Review**

This Court reviews standing determinations de novo, accepting all well-pleaded factual allegations as true and drawing all reasonable inferences in favor of the plaintiff.

## 2. Antitrust Standing Requirements

To establish antitrust standing under Section 4 of the Clayton Act, a plaintiff must show antitrust injury and that plaintiff is an efficient enforcer of antitrust laws. The district court erroneously found both elements lacking.

## 3. Appellant Adequately Alleged Antitrust Injury

Antitrust injury is injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful. Appellant alleged precisely such injury through deliberate systematic technical foreclosure designed to eliminate competitive threats.

### a. Direct Targeting of Competitive Functionality

Appellant specifically alleged that Veamcast applications directly compete with Roku's user engagement capabilities through four core functionalities: (1) remote control interfaces that replace Roku's apps, (2) content discovery engines that aggregate programming across streaming services, (3) social sharing features that enable community viewing experiences, and (4)

21

second screen experiences that enhance user interaction with Roku devices. (Doc. 30, ¶¶ 2, 15, 42).

Recent platform monopolization precedent illustrates that targeted elimination of competitive functionality constitutes cognizable antitrust injury. In *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 58 (D.D.C. 2022), Judge Boasberg held that the FTC plausibly alleged monopolization where Facebook "maintained its monopoly through conditional dealing policies that prevented interoperability between Facebook's platform and competing apps." The court noted that Facebook "enforced these policies by cutting off API access to blunt" competitive threats. See id. at 57-60. Similarly, Judge Leonie Brinkema recently found Google liable for monopolizing ad tech markets via platform restrictions. *United States v. Google LLC*, No. 1:23-cv-00108-LMB-JFA, 2025 U.S. Dist. LEXIS 74956, at *105–06, *114–15 (E.D. Va. Apr. 17, 2025). This mirrors Roku's use of API controls to exclude competitors, supporting an Aspen Skiing violation. The economic theory underlying antitrust injury recognizes that innovation foreclosure harms both individual competitors and market-wide competition. As established in the recent Google Search decision, monopolists exercise power by "degrading the quality of the product while

keeping prices constant," and such quality degradation constitutes economic harm equivalent to supracompetitive pricing. *United States v. Google LLC*, 747 F. Supp. 3d 1, 118 (D.D.C. 2024).

Here, Roku's API restrictions eliminated specific competitive functionalities that differentiated Appellant's applications, forcing a quality-adjusted price increase on consumers who lost access to innovative features while being compelled to use Roku's inferior alternatives.

**Appellant's Own Demonstration of Competition**

In Exhibit 5, Plaintiff demonstrates his software which implemented four specific competitive functionalities (remote control, discovery, sharing, casting) that Roku targeted for elimination. The Appellant narrates, "the Roku functions...have been deprecated" and are now "obsolete… don't work anymore", demonstrating the targeted elimination of competitive features while Roku maintains identical functionality for its own applications.

The district court acknowledged that "Mr. Dean alleges that he directly competes in the market for applications that control and interact with Roku devices. Dkt. 30 ¶ 56–57." (Doc. 60, p. 7). Yet, despite this recognition of Appellant's competitive allegations, the court later concluded that "Mr.

23

Dean made use of Roku's APIs does not make him a competitor." (Doc. 60, p. 14). This contradiction reveals the court's failure to properly consider Appellant's own evidence demonstrating actual competitive functionality. The court's dismissive treatment of Exhibit 5 ignores that this video constitutes Appellant's demonstration of direct functional competition with Roku's services.  This analysis occurred despite the court having earlier struck Appellant's supporting appendix containing Exhibit 5 and other critical evidence without legal justification or explanation. (Doc. 29). The court then ruled on an incomplete record while simultaneously dismissing Appellant's demonstration of competitive functionality that had been improperly excluded from consideration.

The exhibit shows Veamcast providing remote control capabilities, content discovery, social sharing features, and second screen experiences that directly substituted for Roku's native applications, adding features that had the potential to divert user engagement away from Roku, exactly what Roku warned in its 2024 Form 10-K would harm its business: "if our users sign up for offerings and services outside of our streaming platform...our business may be harmed," and "if users reduce their use of our streaming platform for these purchases or subscriptions for any reason, including

opting to pay for services directly with content partners or by other means

for which we do not receive attribution, our business may be harmed."

(Doc. 30, Ex. 14). This demonstrates precisely the competitive relationship

Appellant alleged in his complaint and the Defendant's awareness of it.

The court's failure to recognize the competitive relationship demonstrates

improper weighing of evidence at the pleading stage, compounded by the

court's arbitrary exclusion of supporting evidence that directly established

the competitive relationship. This constitutes Appellant's own testimony

and demonstration of complete foreclosure of competitive functionality

that directly supports his antitrust injury claims. Under Rule 12(b)(6),

courts must accept well-pleaded factual allegations as true and draw all

reasonable inferences in favor of the plaintiff. The court's conclusion that

using APIs "does not make him a competitor" improperly resolved factual

disputes about the nature and extent of competitive functionality rather

than accepting Appellant's demonstration of actual competition.

The procedural unfairness is particularly egregious because the court

struck the very evidence that established competitive functionality, then

concluded that Appellant failed to demonstrate competition, creating an

impossible evidentiary standard where critical supporting materials are

excluded without explanation, then their absence is used to justify dismissal.

**Roku's Own Admissions Confirm Competitive Threat**

Roku's own SEC disclosures confirm the competitive threat posed by third-party applications and Roku's strategic response.  Roku's description of its competitive advantage as "owning and operating both The Roku Channel and our streaming platform" and emphasizing that "The Roku Channel benefits from its integration throughout the Roku Experience" demonstrates exactly why applications like Veamcast posed a competitive threat. They provided alternative user engagement pathways that bypassed Roku's integrated monetization strategy. The systematic API restrictions targeting these competitive functionalities represent Roku's deliberate response to preserve its monopoly over user engagement rather than compete on the merits.

**b. Foreclosure from Relevant Market**

Appellant alleged systematic foreclosure from the market for applications that control and interact with Roku devices. The restrictions rendered Appellant's applications non-functional, eliminating his ability to compete

entirely. This constitutes classic antitrust injury through exclusionary conduct that forecloses market access rather than competing on the merits. Roku's conduct exemplifies classic leveraging theory: using dominance in one market (streaming OS) to foreclose competition in a tied market (device-specific applications). Roku's simultaneous control of OS infrastructure and device APIs eliminates competitive pathways at both the platform and application levels. This integrated dominance forecloses consumer alternatives, reduces output and limits choice.

### c. Individual and Market-Wide Harm

**The Court Incorrectly Required Proof of General Competitive Harm**

The district court erroneously required Appellant to show harm to competition generally rather than recognizing that systematic elimination of individual competitors harms competition itself. The court found that "Mr. Dean does not allege antitrust injury to competition generally, but only claims he was individually harmed" (Doc. 60, p. 12), applying the mechanistic rule that "[a]n antitrust plaintiff must show harm to competition rather than to competitors" (Doc. 60, p. 11). However, this rigid application ignores that when a dominant firm uses exclusionary practices to eliminate willing competitors, both individual and market-wide harm

27

occur simultaneously. The systematic nature of Roku's restrictions, affecting all third-party mobile developers while preserving its own access, demonstrates harm to the competitive process itself that deliberately restricted consumer choice by eliminating entire categories of competitive applications that come with an extensible television operating system. Appellant documented, through Exhibit C, over twelve years of continuous development work involving 2,132 documented code changes and 34,741 file operations, representing substantial personal investments rendered worthless by Roku's conduct. Under established precedent, antitrust standing requires only that injury be plausibly alleged, not proven with trial-level specificity. Contrary to this standard, the district court demanded that Plaintiff prove "financial ability to enter the market," provide "facts about competitors poised and ready to enter," and demonstrate specific "platform substitute" development, all determinations inappropriate for Rule 12(b)(6) evaluation while striking evidence of same. This demonstrates systematic foreclosure that establishes both individual antitrust injury and broader competitive harm, precisely the type of market-wide elimination of competitors that antitrust laws prohibit.

**The Court Missed Evidence of Market-Wide Developer Impact**

The district court erroneously concluded that Appellant failed to allege harm to other developers or the broader competitive process, finding that "There is no injury allegedly suffered to any person other than Mr. Dean; consequently, he has not alleged a harm to competition" and that "Mr. Dean does not identify any developers other than himself." (Doc. 60, pp. 14, 14). This finding directly contradicts the factual record in the SAC. Exhibit 4a documents extensive community forum discussions where multiple developers and Roku Community Streaming Experts acknowledged the targeted elimination of third-party competition. Community Expert "renojim" explicitly stated that "They may be trying to kill off the numerous paid Roku remote apps," directly acknowledging market-wide foreclosure affecting multiple developers.

When Appellant demonstrated his Veamcast platform, Expert "AvsGunnar" acknowledged it as "Looks interesting," but then revealed Roku's hostile attitude toward independent developers, stating "it seems that anytime Roku opens up their devices to external apps they get burned by some douche bag that takes over a Roku device with some kind of scheme to show ads or otherwise make the douche bag money." This

29

demonstrates both recognition of genuinely innovative competitive technology and Roku's systematic mischaracterization of all third-party developers as inherently malicious to justify foreclosure.

Similarly, Exhibit B documents multiple independent developers discovering Roku's undocumented removal of search API functionality, demonstrating systematic harm across the developer community. Developer "DP_Tech" reported that search functionality "is no longer functioning," while developer "user442" stated "I just spent hour trying to figure out why I couldn't do this" before discovering through the forum that Roku had secretly disabled the feature. A Roku Community Moderator officially confirmed the API removal, confirming that multiple developers were affected by undocumented changes that eliminated competitive functionality.

This evidence demonstrates that Roku's API restrictions systematically eliminated entire categories of competitive applications, both "numerous paid Roku remote apps" and search-dependent applications, affecting many developers beyond just Appellant. The court's conclusion that Appellant failed to show competitive harm beyond individual injury

contradicts this documented evidence of market-wide developer elimination and industry recognition of systematic foreclosure.

**McCready Standard Satisfied - Direct Competitive Foreclosure**

The court's application of the McCready "inextricably intertwined" standard is incorrect. In McCready, a patient suffered antitrust injury when her health plan's discriminatory reimbursement policies forced her to choose between continuing therapy with her preferred psychologist or receiving insurance reimbursement, harm directly flowing from the anticompetitive conspiracy.

Here, Appellant's harm is directly intertwined with competitive harm. Roku's targeted API restrictions eliminated Appellant's ability to compete while simultaneously eliminating entire categories of competitive applications, foreclosing both individual and market-wide competition through identical conduct. Unlike cases like McCready, involving downstream consumer effects, Appellant suffered **direct** competitive foreclosure, exactly the type of harm antitrust laws target, which is inherently intertwined with broader competitive harm.

**The Court Misunderstood the Economic Significance of the Affected Markets**

The court's finding that "there is no area of the economy endangered by a breakdown of competitive conditions resulting from Roku's restriction of access to APIs" (R. 60, p. 16) demonstrates fundamental misunderstanding of the competitive harm alleged. This conclusion ignores Appellant's allegations that Roku's covert and retroactive API restrictions affecting **all** third party developers eliminated entire categories of competitive remote control, content curation, social TV and second screen experience applications across the streaming platform market. The court failed to recognize that:

**First**, streaming platforms represent a rapidly growing sector of the economy, with Roku alone controlling access for 90 million households representing billions in consumer spending and advertising revenue.

**Second**, API restrictions that eliminate third-party innovation and consumer choice in this market directly endanger competitive conditions in multiple economic sectors including multimedia communications tools, content discovery, social media and other user engagement platforms, with

some sectors potentially never materializing due to systematic foreclosure of nascent innovation.

**Third**, the systematic anti-competitive nature of these restrictions, first allowing, then restricting all third-party developers while preserving Roku's monopoly over user experience, represents exactly the type of market-wide foreclosure that antitrust laws prohibit.

**The Court Ignored Industry Expert Recognition of Roku's Effort to "Kill Off" Competitor Apps**

The district court's conclusion that systematic API restrictions affecting multiple developers does not constitute competitive harm contradicts established antitrust doctrine. Roku, a dominant platform eliminated entire categories of competitive applications, what a "Roku Community Streaming Expert" explicitly acknowledged as Roku's effort to "kill off the numerous paid Roku remote apps" (Doc. 30, Ex. 4a). This represents precisely the type of competitive foreclosure antitrust laws prohibit. This wholesale elimination was achieved through Roku's official restriction that "ECP commands may not be sent from 3rd-party platforms (for example, mobile applications)" (Doc. 30, Ex. 4b), effectively foreclosing **100%** of the application market for Roku device control while preserving identical

functionality for Roku's own apps. Such complete market-wide foreclosure through technical manipulation demonstrates anticompetitive conduct that harms not merely individual competitors, but the competitive process itself by eliminating consumer choice and stifling innovation across entire product categories and discourages future innovation.

**4. Appellant is an Efficient Enforcer**

Appellant adequately alleged facts showing he was a willing and able competitor in the relevant market but for Roku's exclusionary conduct. As a software developer with substantial, fully documented, investment in Roku-compatible applications, Appellant represents exactly the type of competitor antitrust laws are designed to protect. His direct involvement in developing competing applications and his economic injury from foreclosure demonstrate both motivation and capability to enforce antitrust laws effectively.  He represents the lost opportunities of developers, both present and future, who seek to write applications for television platforms and broaden the ecosystem, and the Appellant is well-suited to vindicate that harm.

## D. THE APPELLANT ADEQUATELY DEFINED THE RELEVANT MARKETS

### 1. Pleading Standards for Market Definition

At the motion to dismiss stage, courts should not impose heightened pleading requirements for market definition. The court erroneously required trial-level economic analysis, finding that Appellant 'fails to define the 'contours' of the product market or reference cross-elasticity of demand and substitutability of any products.' (Doc. 60, p. 18). The dismissal of platform monopolization claims on motion to dismiss should be particularly disfavored given the factual complexity of modern API-based competitive relationships.

### 2. Appellant Adequately Defined Relevant Markets

Appellant specifically identified two relevant markets: (1) applications that interact with Roku devices, and (2) streaming platform operating systems. These constitute distinct product markets based on the economic characteristics required for antitrust market definition.

Roku employs these markets in a coordinated leveraging strategy where dominance in each market reinforces control over the other. Aftermarket

lock-in strengthens Roku's OS market position, while OS control systematically forecloses aftermarket competition.

### 3. Legal Framework for Platform Market Definition

Courts recognize that a relevant market may be defined as an integrated "cluster of products and services" when that reflects commercial reality, rather than requiring feature-by-feature disaggregation. *United States v. Grinnell Corp.*, 384 U.S. 563, 572–75 (1966); *United States v. Connecticut National Bank*, 418 U.S. 656, 664–65 (1974). Roku's platform, its OS, device-control APIs, deep-linking, and discovery interfaces, functions to consumers as one integrated TV experience. Slicing those elements into standalone features would "miss the market" that *Grinnell* and *Connecticut National Bank* permit courts to treat as unified.

### 4. Economic Framework Supporting Market Definition

### a. Functional Interchangeability and Cross-Elasticity Analysis

Applications requiring Roku API access cannot be functionally substituted with other software applications. Only Roku-approved functionality utilizing Roku's proprietary APIs can control Roku devices, access ECP commands, or perform deep linking into channels on Roku devices. Software written for Samsung or Sony TVs will not control a Roku TV, and

mobile apps need the specialized APIs required for Roku device interaction. When Roku disabled critical APIs for third party developers, users had no viable alternatives for enhanced device control.  They were locked into Roku's ecosystem with no cross-platform substitutes available. This platform-specific dependency demonstrates distinct market boundaries where competitive alternatives are technically impossible without Roku's API access.

Price increases (or quality decreases) in Roku-specific applications do not drive consumers to alternative products because no functional substitutes exist. When Roku eliminated third-party remote apps through API restrictions, users could not switch to competing products; they were forced to accept Roku's native apps or forfeit the functionality entirely. This inelastic demand response confirms separate relevant markets.

**b. Supply-Side Substitutability:** Developers cannot easily pivot from creating Roku applications to other platforms due to platform-specific technical requirements, Roku's proprietary BrightScript programming language, mandatory certification processes, and exclusive API dependencies. These switching costs create locks-ins to distinct supply-side markets that prevent competitive arbitrage across platforms.

37

**c. Hypothetical Monopolist Test:** A hypothetical monopolist controlling all Roku device applications could profitably restrict functionality or worsen terms of service because customers have no viable substitutes for controlling their existing Roku devices. When Roku systematically disabled critical API functionality, eliminating search commands, deep linking, and ECP access for third-party applications while maintaining identical capabilities for its own apps, users could not switch to alternative platforms and were forced to accept the reduced functionality or forfeit enhanced device control entirely. This inability to substitute away from Roku-specific applications when faced with degraded service confirms the distinct market boundaries. This was proven by Roku's February 2024 "click-to-unlock" ultimatum, which remotely disabled approximately 80 million devices until users accepted revised legal terms, demonstrating that customers had no viable substitutes and were forced to accept coercive terms or forfeit use of their purchased devices entirely. (Exhibit H)

**d. Unique Competitive Dynamics:** Each market exhibits platform-specific network effects, where value increases with the number of users and developers within that ecosystem. Unlike open software markets where competitors can develop alternative solutions, Roku's gatekeeper control

over essential APIs creates a closed system where the platform operator can systematically eliminate competitors through technical restrictions while maintaining identical functionality for its own applications. This dynamic allows Roku to foreclose entire categories of competitive applications not through superior innovation, but through unilateral control over the technical infrastructure necessary for competition.

### e. Competitive Relationship Evidence

The competitive relationship between Veamcast and Roku's native applications is demonstrated in Exhibit 5, a video demonstration showing Veamcast's functionality before the API restrictions. (Doc. 30, Ex. 5). The video shows Veamcast providing remote control capabilities, content creation, social features, sharing, and second screen streaming functions that directly substitute for Roku's interfaces. As stated in the video: "you can just control your Roku from here but the real purpose of this app is to share things" and shows the user controlling Roku devices through the Veamcast desktop and mobile apps, functionality which will no longer be allowed for any apps except Roku's.

The exhibit demonstrates functional interchangeability—users could accomplish the same tasks (device control, content streaming, discovery,

sharing) through either Veamcast or Roku's applications. However, as the Appellant narrates, these competitive features "have been deprecated" and "don't work anymore" due to Roku's API restrictions, confirming that Roku responded to competitive pressure by eliminating the competitive alternative rather than competing on the merits.

**f. Aftermarket Lock-in Effects:** Under the aftermarket framework established in *Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 476 (1992)*, once consumers purchase Roku devices, they face switching costs to access third-party control applications. Roku's API restrictions deliberately restricted consumer choice by eliminating competitive alternatives, forcing users who want enhanced functionality to either accept only Roku's applications or replace their entire device ecosystem.

This lock-in effect distinguishes Roku-specific applications from the broader software market and supports treating them as a separate relevant market. Roku's API restrictions exploited that lock-in by foreclosing third-party control apps while preserving identical functionality internally.

**g. Distinguishing Ohio v. American Express**

This case is distinguishable from *Ohio v. American Express Co.,* 585 U.S. 529, 2280-81 (2018), where the Supreme Court applied two-sided market analysis to credit card networks that facilitate beneficial transactions between merchants and cardholders. Unlike Amex's transaction platform that provided offsetting benefits to cardholders, Roku's API restrictions do not facilitate beneficial transactions between two market sides but instead eliminate competitive alternatives that provide consumer value through enhanced device functionality and content sharing and discovery. As detailed in the SAC appendix analysis (Doc. 30, App. p. 58), this conduct produces the anticompetitive effects. *AmEx* identified reduced output, increased prices, or decreased quality in the relevant market.

**h: Relevant Product Markets:** The first market encompasses applications requiring specialized APIs to control and interact with Roku devices. This market has distinct characteristics including high barriers to entry through exclusive API control, network effects between users and developers, and technical requirements that limit substitutability.

The second market encompasses streaming platform operating systems including embedded TV operating systems, platform services, content

41

discovery interfaces, and advertising delivery systems. This market exhibits substantial barriers to entry, network effects, and requirements for technical expertise and manufacturer relationships.

This market definition is supported by industry recognition of 'Roku apps' as distinct products requiring specialized BrightScript development expertise and serving Roku device owners exclusively.

Recent precedent supports narrow market definitions for digital platform services. In *United States v. Google LLC* (Ad Tech), Judge Brinkema conducted extensive market definition analysis for digital advertising platforms, finding that "publisher ad servers for open-web display advertising constitute a distinct relevant product market" despite Google's arguments for broader market inclusion. No. 1:23-cv-00108-LMB-JFA, 2025 U.S. Dist. LEXIS 74956, at \*43–44 (E.D. Va. Apr. 17, 2025). The court rejected defendant's contention that "the entire digital ad tech ecosystem" should constitute a single market, instead finding separate markets based on "unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Id. at \*42–43 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). Judge Brinkema emphasized that market definition must reflect "commercial realities" and involve

"pragmatic, factual" rather than "formal, legalistic" analysis. Id. at *42 (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992)). Applying this framework, Roku's streaming platform operating system similarly constitutes a distinct market characterized by specialized BrightScript development requirements, platform-specific APIs, exclusive device integration, and lack of functional substitutes—precisely the "practical indicia" courts examine for separate economic entities.

### 5. Additional Factual Development Through Discovery

Market definition issues are typically resolved through economic expert testimony and discovery, not at the motion to dismiss stage. The court prematurely dismissed claims that could be supported through factual development.

### E. THE EVIDENCE ESTABLISHES ROKU'S MONOPOLY POWER
### 1. Direct Evidence of Monopoly Power

Appellant alleged substantial direct evidence of monopoly power beyond market share. Roku maintains exclusive control over essential APIs necessary for competition and can unilaterally modify or remove access without market consequences. This control over essential infrastructure demonstrates the ability to act independently of competitive forces.

Roku achieved **100**% foreclosure of the market for remote control and other ECP-dependent applications through its restriction that "ECP commands may not be sent from 3rd-party platforms (for example, mobile applications)" (Doc. 30, Ex. 4b) while maintaining identical functionality for its own mobile app.

Additional direct evidence includes Roku's power to implement contradictory technical requirements without justification, capacity to advantage its own services through platform modifications, and ability to implement coercive firmware lock-outs forcing acceptance of updated legal terms affecting over 80 million devices. These actions deliberately restricted consumer choice while demonstrating actual exercise of monopoly power.

CEO Anthony Wood's statements reveal Roku's deliberate strategy to exploit both markets. His declaration that 'the future of TV is not apps' directly explains why Roku eliminated third-party applications in the aftermarket, while his repeated emphasis on 'power[ing] every TV in the world' demonstrates intent to monopolize the broader OS market.  His statement, "We added … a single new row to the home screen with recommendations and we're seeing that drive … significant increases in subscription signups as well as significant engagement… it's one of the

reasons that the Roku channel grew 84% globally year-over-year in the quarter", demonstrates Roku's ability to leverage its gatekeeper position over the home screen interface to directly and dramatically influence consumer behavior and market outcomes.

Direct evidence of monopoly power includes the ability to profitably degrade quality or restrict output without competitive constraint. *United States v. Google LLC*, 747 F. Supp. 3d 1, 118 (D.D.C. 2024) (monopolist can increase "quality-adjusted price by degrading the quality of the product"); *United States v. Google LLC*, No. 1:23-cv-00108-LMB-JFA, 2025 U.S. Dist. LEXIS 74956, at *42–43 (E.D. Va. Apr. 17, 2025) (monopoly power shown by "exclusive control over critical APIs" and ability to alter access without market retaliation); *United States v. Microsoft Corp.*, 253 F.3d 34, 59–60 (D.C. Cir. 2001) (power evidenced by restricting access to essential facilities). In *FTC v. Meta Platforms, Inc.*, No. 1:20-cv-03590-JEB (D.D.C. 2025), the FTC presented direct evidence of monopoly power, showing the defendant: "(i) has reaped enormous sustained economic profits...materially powered by imposing [restrictions] on U.S. users" and "(ii) has profitably degraded quality without losing material usage." Plaintiff Federal Trade Commission's Post-Trial Reply and Opposition Memorandum at 6–8, *FTC*

*v. Meta Platforms, Inc.*, No. 1:20-cv-03590-JEB (D.D.C. filed Aug. 29, 2025). The FTC noted that "ad load is a price...paid with a user's time and attention rather than in dollars and cents," identifying these as "well-recognized hallmarks of monopoly power." Id. at 7.

This aligns with Judge Brinkema's finding that Google held monopoly power through "exclusive control over essential APIs necessary for competition" and ability to alter access without market consequences. *United States v. Google LLC,* No. 1:23-cv-00108-LMB-JFA, 2025 U.S. Dist. LEXIS 74956, at *42–43 (E.D. Va. Apr. 17, 2025). Together, these decisions establish API control as direct evidence of monopoly power in digital platforms. Roku exhibits this through systematic API restrictions that eliminated consumer functionality in third-party apps while preserving identical features for its services, degrading quality without user defection, demonstrating its ability to impose supracompetitive terms free from competitive constraint.

**3. Circumstantial Evidence of Market Dominance**

Beyond the 48.3% market share, Appellant alleged additional evidence of market dominance including dramatic growth trajectory from 33% to 48.3% in just four years (2020-2024), expansion to 90 million streaming

46

households by February 2025, accelerating platform revenue growth of 18% in 2024, control of licensing relationships with 15+ TV manufacturers, and Roku's own description of itself as the dominant platform with presence in nearly half of all U.S. broadband households.

**Wood's Direct Admissions of Monopolistic Intent and Platform Abuse**

Wood's own statements provide overwhelming direct evidence of Roku's monopoly power and systematic plan to abuse that position. His admissions span from global monopolization intent to specific platform weaponization strategies.

**Global Monopolization Intent:** Wood has repeatedly expressed ambitions beyond normal competition: "Roku's mission is to power every TV in the world, that's what we're focused on" (Doc. 30, Ex. 12) and "Our goal is to power every TV in the world" (Doc. 30, Ex. 13). Combined with his boast that "Roku is the leading streaming platform in the US by a wide margin. We stream a lot more hours than any of our competitors" (Doc. 30, Ex. 2), these statements demonstrate intent to achieve global monopoly power.

**Platform Control as Competitive Weapon:** Wood explicitly described weaponizing Roku's platform advantages: "our job is to show them that because we have platform-wide data, we can do a better job of

47

merchandising than they can do on their own" and "For 90% of our customers, that will be the case, they will get more viewing and better economics by working with us directly" (Doc. 30, Ex. 3).

**The Frndly Acquisition Is Direct Evidence of Platform Leveraging Denied to Competitors:** The May 1, 2025 Frndly TV acquisition provides particularly damning evidence of Roku's monopoly power and systematic platform abuse that Appellant sought to include in the denied Third Amended Complaint. In Roku's Q1 2025 earnings call (Exhibit E), CEO Wood explicitly admitted the company's strategy to weaponize its platform dominance: "We're going to use that [platform power] to drive subscriptions. We're going to use that to drive advertising, we're going to use that to drive Frndly." This admission demonstrates precisely the type of platform leveraging that Roku uses to disadvantage competitive third-party developers like Veamcast. The acquisition's financial terms, $185 million for a streaming service, combined with Roku's promise that the service would benefit "simply by being inside of our recommendation engines" and "being inside of our sales team" confirms what Appellant alleged. Roku systematically advantages its own services through platform control while foreclosing identical opportunities for competitors. Charlie

48

Collier's admission that "there are brands inside Frndly that will be elevated simply by being focused on by Roku" demonstrates the exact competitive advantage Roku denies to competitors through its API restrictions.

**Systematic Competitive Elimination:** Wood's statements reveal deliberate foreclosure strategy. After announcing that Roku would "let third parties publish content and applications that consumers can access directly from their TV" (Doc. 30 ¶ 5) and implementing open API access, Wood, after reaching dominance declared "The future TV is not apps" and "people are tired of looking in 6,000 apps for content" (Doc. 30, Ex. 2), directly explaining why Roku systematically eliminates third-party developers. Wood further admitted systematic content consolidation: "As it gets bigger and bigger and has more and more content, you can imagine someday it might become the Roku home screen", speaking of the Roku Channel (Doc. 30, Ex. 2).

**Data Monopolization:** Wood explicitly admitted to undisclosed data exploitation strategies: "We understand the value of our data...there's a lot of activities going on to expand the way we monetize our data. We just haven't necessarily announced what they are or talked about them

directly." (Doc. 30, Ex. E). This admission reveals Roku's deliberate strategy to leverage platform-exclusive data advantages while concealing those competitive methods from rivals and from the public, allowing Roku to systematically exploit user data and platform information that is unavailable to competitors, in any way they see fit.

## 4. Barriers to Entry and Network Effects

Appellant alleged substantial barriers to entry including network effects between users, content providers, and developers; exclusive control over essential APIs; technical expertise requirements; mandatory certification requirements; and substantial switching costs. These barriers protect and enhance Roku's market position while preventing competitive entry.

## F. THE DISTRICT COURT ERRED IN FINDING ROKU'S DISCRIMINATORY API TERMINATION LAWFUL UNDER ASPEN SKIING

## 1. This Case Falls Within the Narrow Aspen Skiing Exception, Not the Trinko/Morris No-Duty Rule

The district court misapplied *Verizon Communications Inc. v. Trinko*, 540 U.S. 398, 408–11 (2004), and *Morris Communications Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1294–95 (11th Cir. 2004), by treating Roku's conduct as a general

refusal to deal. Both *Trinko* and *Morris* limit liability only where there is no prior voluntary and profitable course of dealing.

Here, Appellant alleged the opposite: Roku maintained an open and profitable developer program for years, publicly encouraging reliance and investment. Roku's CEO promised to "let third parties publish content and applications that consumers can access directly from their TV" (Doc. 30 ¶ 5), and third-party developers invested and created accordingly. Roku then discriminatorily, covertly and retroactively revoked access, targeting competitive features while maintaining identical functionality internally. Roku's own statements confirm the profitability of developer relationships. In a February 2025 email communications to Roku developers, Roku explicitly acknowledged that 'This incredible growth is largely due to our amazing developers' (Doc. 30, Ex. A1), directly admitting that third-party innovation drove Roku's market success. However, in a press release linked to from that same email, Roku claimed 'Roku's extensive scale sets us apart in the streaming industry' while emphasizing features like 'Universal Search, What to Watch, and Live TV Guide' that 'make it easy to find your favorite content across multiple apps', all providing functionality that favors The Roku Channel.  Notably the press release didn't have any

51

mention of developers' contributions, having credited them for the same growth in the developer email. Instead, they credit it to "laser focus on simplifying and enhancing the streamer's journey." (Doc. 30, Ex. A2). Having built market dominance through developer contributions, Roku then discriminatorily revoked the very access that enabled those contributions, preserving competitive functionality only for its own applications while foreclosing the developers it previously credited for its success.

This case falls squarely within the *Aspen Skiing* exception for discriminatory revocation of a profitable course of dealing, 472 U.S. at 605, not within *Trinko's* no-duty framework.

**2. Roku's Conduct Satisfies All Elements of an Aspen Skiing Violation**

**a. Prior Voluntary and Profitable Course of Dealing**

Roku cultivated and profited from an open developer ecosystem for years. Appellant and others invested time, code, and resources in reliance on Roku's APIs and developer promises. This voluntary course of dealing generated ecosystem effects that benefitted Roku directly through increased device sales, app diversity, and consumer engagement.

**b. Sacrifice of Benefits to Achieve Anticompetitive End**

Roku deliberately abandoned these ecosystem benefits to foreclose competition. Like in *Aspen Skiing*, 472 U.S. at 610-11, Roku was willing to forsake profitable and beneficial partnerships to achieve an anti-competitive end. Instead of continuing a profitable collaboration, Roku chose foreclosure, ensuring that only Roku-owned applications could maintain full device functionality.

**c. Discriminatory Denial of Equal Access**

Appellant alleged that Roku revoked from third parties the same API access it maintained for its own applications. This was not a neutral business decision, but discriminatory foreclosure targeting competitors. See *Aspen Skiing*, 472 U.S. at 608. Third-party applications lost essential ECP, deep linking and search functionalities, while Roku's own mobile app retained identical capabilities, demonstrating systematic discrimination.

**3. Federal Courts Recognize API Termination as Anticompetitive Conduct**

Federal courts have explicitly recognized that revocation of API access can constitute unlawful monopolization. In *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001), the D.C. Circuit affirmed liability where Microsoft

disabled APIs that competing software relied upon, finding that this conduct maintained monopoly power by foreclosing competitive alternatives. Similarly, in *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34 (D.D.C. 2022), Judge Boasberg held that the FTC plausibly alleged monopolization where Facebook "maintained its monopoly through conditional dealing policies that prevented interoperability between Facebook's platform and competing apps."

The court distinguished general refusals to deal from revocations of prior access targeting competitive threats. The FTC's complaint alleged that Facebook "enforced these policies by cutting off API access to blunt perceived competitive threats" and "imposed anticompetitive conditions on software developers" as a key method of maintaining monopoly power. Roku's conduct here is analogous.

The D.C. Circuit in *Microsoft* condemned precisely this type of leveraging conduct, finding that Microsoft "placed an oppressive thumb on the scale of competitive fortune, thereby effectively guaranteeing its continued dominance in the relevant market." *United States v. Microsoft Corp.*, 253 F.3d 34, 61 (D.C. Cir. 2001). The court recognized that when a monopolist controls essential technical interfaces, using that control to disadvantage

competitors constitutes anticompetitive maintenance of monopoly power rather than legitimate business competition.

Recently, in *United States v. Google LLC*, Judge Leonie Brinkema explicitly held that API restrictions and platform controls constitute unlawful monopolization under Section 2 of the Sherman Act. No. 1:23-cv-00108-LMB-JFA, 2025 U.S. Dist. LEXIS 74956, at *105–12 (E.D. Va. Apr. 17, 2025). The court found that Google "tied its publisher ad server and ad exchange together through contractual policies and technological integration" and used these restrictions to "establish and protect its monopoly power." *Id.* at 114. Judge Brinkema rejected Google's technical justifications, finding that the company's "exclusionary conduct substantially harmed Google's publisher customers, the competitive process, and, ultimately, consumers." *Id.* at 114–15. Critically, the court held that Google's conduct constituted "willful acquisition or maintenance of [monopoly] power" through systematic foreclosure of competitive alternatives via platform control. *Id.* at 112. This holding directly validates Appellant's theory that Roku's systematic API restrictions—implemented through identical "contractual policies and technological integration"—constitute per se monopolization under established Sherman Act precedent.

55

The *Facebook* case provides an even more direct parallel to Roku's conduct. The FTC alleged that "Facebook actively invited app developers onto its platform, granting them open access to critical application programming interfaces ('APIs') and tools needed to interconnect with Facebook. This open access policy drove developer and user engagement with Facebook, which in turn helped to fuel Facebook's massive advertising profits. But as developers expanded popular offerings, Facebook came to view them as a threat, recognizing that some could aid emerging rivals or even challenge Facebook directly. In response, Facebook retooled its API policies into an anticompetitive weapon." *FTC v. Meta Platforms, Inc.*, No. 1:20-cv-03590-JEB, First Amended Complaint ¶ 8 (D.D.C. Aug. 19, 2021).  This description precisely mirrors Roku's strategic evolution from encouraging third-party development to systematically foreclosing competitive applications through API restrictions while preserving identical functionality for its own services. Appellant directly experienced this identical conduct from Facebook, as detailed in the related case *Dean v. Meta Platforms, Inc.*, No. 8:24-cv-02242-MSS-TGW (M.D. Fla.), demonstrating that API weaponization constitutes a common anticompetitive strategy employed across dominant platforms to eliminate competitive threats rather than

56

isolated platform governance decisions. Industry practice traditionally treats published APIs as immutable contracts, as developers invest substantial resources building applications that depend on these interfaces remaining stable and accessible. Sudden changes violate fundamental software engineering principles and break existing integrations that developers have built in reliance on documented specifications. When dominant platforms weaponize this reliance by selectively terminating API access to eliminate competitive threats, such conduct transforms legitimate platform governance into exclusionary monopolization.

**4. Systematic Elimination of Nascent Competitive Threats**

Federal antitrust enforcement recognizes that platform monopolists systematically acquire or eliminate nascent competitive threats before they can mature into effective rivals. As the FTC argued in Meta, defendants cannot claim antitrust laws should "celebrate [their] monopolistic acquisition of nascent threats because the apps [they] spent billions to acquire are widely used." FTC Post-Trial Reply Brief at 2, No. 1:20-cv-03590 (D.D.C. 2025). The proper antitrust analysis recognizes that "gone now are the various other firms capable of running...wildly successful apps" due to the monopolist's systematic foreclosure. Id.

Roku employed identical tactics against Appellant, but through technical rather than acquisition-based elimination. After Appellant demonstrated competitive streaming functionality through successful App Review processes, Roku systematically disabled the APIs that enabled such competition. This represents the digital equivalent of nascent competitor elimination—allowing potential rivals to demonstrate their capabilities, then foreclosing their access to essential infrastructure.

The controlling precedent in *United States v. Microsoft Corp.* 253 F.3d 34, 79 (D.C. Cir. 2001) established that "it would be inimical to the purpose of the Sherman Act to allow monopolists free reign to squash nascent, albeit unproven, competitors at will, particularly in industries marked by rapid technological advance and frequent paradigm shifts.". Modern platform cases confirm this principle applies equally to technical foreclosure through API restrictions.

## 5. Roku's "Contradictory Security Requirements" Were Designed to Eliminate Competition and Prevent Future Entrants

The district court erred in accepting Roku's contradictory API restrictions as legitimate security measures. The timing and structure of these requirements reveals their anticompetitive purpose.

**Initial Foreclosure Through Single Restriction (Pre-Litigation)**

When Appellant initially filed this lawsuit, Roku had recently announced one clear restriction: "ECP commands may not be sent from 3rd-party platforms (for example, mobile applications)." (Doc. 30, Ex. 4b). This single prohibition effectively foreclosed **100**% of the mobile application market for Roku device control while preserving identical functionality for Roku's own applications.

**Post-Litigation Addition of Contradictory Requirement**

After litigation commenced challenging this restriction, Roku added a second, contradictory requirement in February 2025: "As of Roku OS 14.1, the Control by mobile apps setting must be Enabled for a Roku device to receive ECP commands." (Doc. 30, Ex. A3). This new mandate directly conflicts with the existing prohibition.

**The Impossibility Creates Anticompetitive Cover**

These requirements cannot be satisfied simultaneously by any third-party developer:

- **Original restriction**: Prohibits all third-party mobile applications from sending ECP commands

- **Added requirement**: Mandates that mobile app control must be enabled for ECP functionality

The strategic timing demonstrates Roku's intent to create technical pseudo-justification for competitive foreclosure. By adding the contradictory requirement post-litigation, Roku can now point to "security requirements" while maintaining the same impossible compliance framework that systematically eliminates all third-party competition.

Judge Jung found that Roku's "announced contradictory security requirements for ECP commands... suggests a valid business reason of maintaining security for third-party access to software" (Doc. 60, p. 15). However, this finding was in error because these contradictory requirements cannot serve legitimate security purposes—they create impossible compliance scenarios designed to eliminate competition while maintaining plausible deniability.

Independent recognition underscores the impossibility. In Roku's own forums, "renojim," a Community Streaming Expert, wrote: "They may be trying to kill off the numerous paid Roku remote apps … it doesn't make any sense. If not from 3rd party platforms, then what good would ECP be?"

60

(Doc. 30, Ex. 4a). This expert assessment confirms the anticompetitive character of Roku's evolving restrictions.

**5. The Court Misunderstood the Economic Significance of the Affected Markets**

The district court treated Roku's conduct as a narrow refusal to deal with one developer, ignoring its market-wide foreclosure effects.

**Scale of Control:** Roku controls access to streaming television for more than 90 million households, representing billions in consumer spending and advertising. These APIs are the gateway to competition across entire categories of applications.

**Systematic Elimination of Innovation:** Roku's restrictions foreclosed entire classes of products, including remote control apps, communication tools, discovery tools, social sharing platforms, and second-screen experiences. This was not an isolated refusal but deliberate systematic foreclosure.

**Discriminatory vs. Neutral Conduct:** Roku preserved full interoperability for its own apps while cutting off competitors, confirming discriminatory purpose. As stated in their 10-K, Roku confirmed that third-party

applications enabling users to bypass Roku's revenue streams pose a direct threat to their business model.

When a dominant platform forecloses access to 90 million households through contradictory and targeted restrictions, the economic harm extends to consumer choice, innovation, and the competitive process itself. That is precisely what *Aspen Skiing* forbids.

## 6. Discriminatory Denial of Interoperability

Roku discriminatorily revoked interoperability previously provided and relied upon, after inducing developer investment. Courts consistently recognize that such discriminatory revocation, unlike general refusals to deal, falls within established antitrust prohibitions. This discriminatory denial of interoperability squarely fits the *Aspen Skiing* framework and modern precedent such as U*nited States v. Microsoft* and *FTC v. Facebook*. Roku's conduct fits a familiar pattern condemned in *Microsoft* and recognized in *Facebook*: a dominant platform entices third-party innovation, then withholds/retunes interfaces (APIs) to neutralize competitive threats, while preserving the same capabilities for itself. Because Roku's platform is consumed as an integrated cluster (*Grinnell; Connecticut National Bank*) and because owners are locked in after purchase (*Kodak*), Roku could profitably

degrade quality by removing third-party features without losing users—an exercise of monopoly power. That discriminatory revocation of a prior, beneficial course of dealing places this case within *Aspen Skiing*, not *Trinko*. Roku (i) voluntarily opened and profited from a developer program for years; (ii) then withdrew previously available API access selectively as rivals emerged; and (iii) accepted short-term losses in ecosystem value to suppress competition, while maintaining the same functionality for its own apps. See 472 U.S. at 605–11. *Trinko/Morris* address initial refusals or neutral policy changes; they do not immunize a monopolist's discriminatory revocation of interoperability used as a weapon. See *Microsoft*, 253 F.3d at 59–61; *Facebook*, 581 F. Supp. 3d at 57–60.

## G. APPELLANT HAS INDIVIDUAL STANDING TO BRING THESE CLAIMS

Appellant adequately alleged individual standing through personal development, ownership, and economic harm from Roku's anticompetitive conduct.

### 1. Personal Development Since 2010

Appellant personally developed all Veamcast technology beginning in 2010 as an individual entrepreneur.  He invested his own time, money,

resources, and expertise for years developing the core platform before integrating with Roku's streaming services.

## 2. Individual Ownership of All IP Rights

Appellant retained all intellectual property rights and asset ownership. While corporate entities were formed in 2012 and 2016 for potential business purposes, no intellectual property assignment agreements, board resolutions, or other corporate formalities were executed to transfer ownership. Intellectual property created by an individual remains personal property unless expressly assigned. *See Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776, 785 (2011) (Inventions belong to the inventor unless there is an assignment.); *DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008) (pre-existing IP remains with the inventor absent formal conveyance); *FilmTec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1572 (Fed. Cir. 1991) (distinguishing valid present assignments from unenforceable promises to assign).

Corporate formation alone does not divest an individual creator of pre-existing rights, nor may corporate officers unilaterally appropriate personal IP without authorization and consideration.

### 3. Direct Personal Economic Harm

Appellant suffered concrete injury traceable to Roku's conduct including:

- 12+ years in stranded development costs

- Lost revenue from foreclosed market access

- Wasted investment in Roku-compatible technology

- Elimination of competitive business opportunities

### 4. Corporate Entities Were Shells for Investment That Didn't Occur

The corporate entities had no investors, employees, bank accounts, or independent operations. They never hired counsel. They were formed solely for potential investment purposes that were foreclosed by Roku's anticompetitive restrictions as key features became nonviable due to foreclosure.

### 5. Standing Exists Independent of Corporate Claims

Appellant's individual standing exists independently of any corporate entities because Appellant suffered direct personal injury distinct from any corporate harm. Appellant personally developed the technology as an individual entrepreneur beginning in 2010, retained all intellectual property rights, and suffered concrete economic injury from Roku's targeting of his individual development work. The court's conclusion that

65

Appellant "fails to identify any lost business opportunities, investment, change in market share, or economic harm" is an error in applying pleading standards. (R. 60, p. 12). Appellant specifically alleged concrete business harms including complete elimination from the market, foreclosure from Roku's 90 million and rapidly growing streaming households, lost revenue from social sharing and community features, and many years in wasted development investment.

At the Rule 12(b)(6) stage, these plausible allegations are sufficient to establish concrete injury without requiring the detailed financial analysis appropriate for summary judgment or trial. Nevertheless, Appellant already provided extensive documentation of development costs and damages methodology in the SAC Exhibit C, but after striking this very evidence, the court still demanded additional proof inappropriate for the pleading stage.

## H. THE COURT CREATED AN PROCEDURAL TRAP
### 1. The District Court Created an Impossible Procedural Trap

In *Veamcast Corp. v. Facebook,* Judge Honeywell specifically instructed that "if Dean seeks to proceed on his own behalf, Dean is given a period of sixty (60) days from the date of this Order to submit an amended complaint

setting forth claims he maintains on behalf of himself, rather than on behalf of Veamcast." *Veamcast Corp. v. Facebook, Inc.*, No. 8:20-cv-2667-T-36AEP, 2020 WL 7248226, at *3 (M.D. Fla. Dec. 9, 2020).

Appellant followed this judicial guidance, filing individually rather than corporately, only to be dismissed for the very approach the court had recommended.

## 2. Alternative Relief Should Have Been Granted

In the interest of due process, if the court found individual standing insufficient, then the court should have offered reopening of the corporate case:  Under Fed. R. Civ. P. 15(c), amendments adding parties relate back when they arise from the same occurrence.

## 3. Court Instructions Create Reasonable Reliance

Prior Court guidance expressed instruction to pursue claims individually created reasonable reliance. Appellant structured litigation strategy around court's guidance, incurring substantial costs and time. The court cannot first recommend individual pursuit, then dismiss for pursuing individually.

## VI. CONCLUSION

For the foregoing reasons, this Court should REVERSE the district court's dismissal and REMAND for further proceedings. The district court committed multiple errors requiring reversal:

(1) **Procedural Due Process Violation**: Striking Plaintiff's supporting appendix without legal justification or explanation, depriving Plaintiff of the opportunity to be heard and eliminating critical evidence from the record;

(2) **Improper Denial of Leave to Amend**: Denying leave to file a Third Amended Complaint without examining whether the proposed amendments would cure identified deficiencies, violating Rule 15(a)(2)'s liberal amendment standards;

(3) **Erroneous Market Definition Analysis**: Dismissing adequately pleaded relevant markets for Roku device applications and streaming platform operating systems supported by functional interchangeability and economic analysis;

(4) **Insufficient Monopoly Power Analysis**: Ignoring extensive direct and circumstantial evidence of monopoly power, including 100% market

68

foreclosure through technical restrictions, exclusive API control, and rapid market share growth;

(5) **Misapplication of Refusal-to-Deal Doctrine**: Mischaracterizing Roku's discriminatory termination of a prior profitable course of dealing as mere refusal to deal when the conduct fell squarely within the *Aspen Skiing* exception for revocation of beneficial and profitable cooperation;

(6) **Standing Error**: Finding insufficient antitrust injury and efficient enforcer status despite allegations of systematic foreclosure targeting competitive functionality;

(7) **Individual Standing Error**: Dismissing for lack of individual standing where Appellant alleged personal economic harm from developing applications in his individual capacity while retaining all intellectual property rights; and

(8) **Procedural Trap**: Creating an impossible procedural situation by dismissing for individual standing after prior judicial guidance from this district encouraged individual pursuit of claims, then failing to provide alternative relief.

These errors prevented adjudication on the merits of legally cognizable claims involving platform monopolization through API restrictions,

conduct that established precedent from *United States v. Microsoft Corp.* and recent decisions like *FTC v. Facebook* recognize as potentially violating federal antitrust laws.

In the alternative, should this Court determine that the proper plaintiff is Veamcast Corp., Appellant respectfully requests remand to permit the corporation to obtain counsel and replead under Rule 17(a)(3).

Respectfully submitted,

Joseph Dean, Pro Se

Plaintiff – Appellant

5131 Mayfair Park Court

Tampa, Florida 33647

(310) 593-4485

joe@joedean.net

**Dated**: September 25, 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains approximately 11,366 words, excluding the parts exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Book Antiqua.

Joseph Dean Pro Se, Plaintiff-Appellant

5131 Mayfair Park Court

Tampa, Florida 33647

(310) 593-4485

 joe@joedean.net

**Dated**: September 25, 2025

71

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the

United States Court of Appeals for the Eleventh Circuit using the ECF

system. I further certify that I served this document (attached as a PDF) on

the following counsel for Defendant-Appellee Roku, Inc. via email:

- Elizabeth C. DeGori, Dentons US LLP at elizabeth.degori@dentons.com

- Norman Aspis, Dentons US LLP at norman.aspis@dentons.com

- Bety Javidzad, Dentons US LLP at bety.javidzad@dentons.com

I declare under penalty of perjury that the foregoing is true and correct.

Joseph Dean Pro Se, Plaintiff-Appellant

5131 Mayfair Park Court

Tampa, Florida 33647

(310) 593-4485

joe@joedean.net

**Dated**: September 25, 2025